UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                    :
RAYMOND RAMOS,
                                                    :
                    Plaintiff,                              OPINION AND ORDER
                                                    :
          -against-                                        18 Civ. 1783 (GWG)
                                                    :
NANCY A. BERRYHILL
Acting Commissioner of Social Security,             :

                    Defendant.                      :
-----------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

Plaintiff Raymond Ramos brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security (the "Commissioner")

denying his claim for Disability Insurance Benefits ("DIB") under the Social Security Act (the

"Act"). Both parties have moved for judgment on the pleadings pursuant to Federal Rule of

Civil Procedure 12(c).[1] For the reasons stated below, Ramos's motion for remand is denied and

the Commissioner's motion is granted.

I. BACKGROUND

    A. Procedural History

Ramos applied for DIB on July 8, 2014. See Certified Administrative Record, filed Aug.

13, 2018 (Docket # 13) ("R."), 175-81. He alleged that his disability began on February 7, 2014,

when he was 54 years old. R. 175.

---

[1] See Motion for Summary Judgment, filed Oct. 15, 2018 (Docket # 15); Memorandum
of Law in Support of Plaintiff's Motion for Summary Judgment on the Pleadings, filed Oct. 15,
2018 (Docket # 16) ("Pl. Mem."); Notice of Motion for Judgment on the Pleadings, filed Dec.
17, 2018 (Docket # 20); Memorandum of Law in Support of Defendant's Cross-Motion for
Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the
Pleadings, filed Dec. 17, 2018 (Docket # 21) ("Def. Mem.").

The Social Security Administration ("SSA") denied the application on October 24, 2014, R. 97-108, and Ramos sought review by an Administrative Law Judge ("ALJ"), R. 109-16. A hearing was held on June 21, 2016. R. 37. In a written decision dated August 5, 2016, the ALJ found Ramos was not disabled within the meaning of the Act. R. 22-30. On December 22, 2017, the Appeals Council denied Ramos's request for review of the ALJ's decision. R. 1-4. This action followed.

B.   The Hearing Before the ALJ

The hearing was held before ALJ Elias Feuer in the Bronx, New York. R. 37. Ramos appeared at the hearing in person and was represented by attorney Joju Thomas. R. 37. Ramos testified that he had been living in an apartment in the Bronx for the past 20 years, that he was born on August 8, 1960, and that his highest level of education completed was twelfth grade. R. 39. In terms of work-related licenses or certifications, he had a security license, a "[c]abby's permit," and a driver's license. R. 40.

Ramos testified that he worked as a corrections officer for the City of New York for 20 years before retiring "around 2005." R. 49. While working as a corrections officer, Ramos worked on Riker's Island at the Adolescent Reception Detainee Center, but later transferred to Central Booking in Manhattan, at 100 Centre Street. R. 50. While Ramos's "command" was located at 100 Centre Street, when he worked at Central Booking he actually worked in "111 security," located in the basement of a building across the street. R. 55-56. That position was a "sitting post." R. 55. Ramos estimated he was stationed at the "sitting post" for approximately three years prior to his retirement in 2005. R. 55-56. In that position, Ramos would work from 7:00 a.m. to 3:00 p.m., and would be seated at his post for most of the day except from about 9:00 a.m. to 10:00 a.m., when prisoners would arrive by bus for their court appearances. R. 56-

2

57.  At that time, Ramos would "secure the area" by standing on the side with his firearm as prisoners arrived by bus.  R. 56.  His position also entailed calling judges and ensuring that the incarcerated parties arrived in court.  R. 56.

After retiring with a "straight pension," in 2005 (as opposed to a "disability pension"), R. 49, Ramos worked in various armed private security positions until February 2014.  R. 40-43.  All of those jobs involved patrolling, rather than sitting at a security desk.  R. 42.  During the periods he was working in corrections and armed security, he would also sometimes work for the security company Brink's, providing private security during jewelry shows at convention centers, where he would "carry big boxes of jewelry."  R. 78.  The last position Ramos held was working as an armed security guard at TD Bank.  R. 42-43.  He worked at that position until he was laid off on February 7, 2014.  R. 43.  After being laid off, Ramos collected unemployment insurance for approximately six months, R. 43-44, at which point the laid off workers from TD Bank were called in for another job, R. 44.  Although Ramos was called back to work, he did not accept the position and never returned to work because of pain he was experiencing in his left shoulder.  R. 44-45.

After his termination and while he was collecting unemployment, Ramos applied for many security jobs, and also attended "seminars" to assist in his job search.  R. 46-48.  Ramos interviewed with security firms in the Bronx and Manhattan for armed security positions, but all of those jobs involved patrolling.  R. 47-48.  He testified that while he applied for armed security positions that only involved sitting at a desk, he was never called to interview for those positions.  R. 48.  Ramos confirmed that once his unemployment benefits ended, he stopped searching for work, explaining that he felt that he "couldn't work anymore due to [his] medical condition."  R. 50.

Ramos testified about the income he currently receives. He receives "a little over $30,000 a year" in pension from his work as a corrections officer, as well as money from a "Variable Supplement Fund," that he had been receiving from the City for the two years prior to the hearing, which came to about "$12,000 before taxes," though the amount can vary based on market conditions. R. 49-50.

Ramos testified about the impairments that prevent him from working as a security guard. Ramos identified pain in his back, knees, and left shoulder as the source of his inability to work. R. 51. Ramos testified that, in terms of medication, he takes the pain medication Tramadol at night, as well as Gabapentin, a seizure medication, which also helps with his back pain, during the morning and at night. R. 51-52.

When discussing his shoulder pain, the ALJ asked Ramos to confirm that he initially injured his left shoulder while "working out." R. 58. Ramos denied this, and stated that he didn't know how the injury occurred. R. 58. Ramos explained that after his shoulder pain grew increasingly worse, he found out that he had a torn rotator cuff, and had surgery, which "didn't go well." R. 58. After his first surgery, Ramos returned to his position as a private security officer at TD Bank. R. 58. Ramos underwent a second surgery on his left shoulder on February 12, 2014, several days after being laid off from his TD Bank position. R. 45.

Ramos's attorney then questioned Ramos about his knee injuries. Ramos confirmed that he had orthoscopic surgery performed on both knees in 2014, after he stopped working, because it "felt like crushed glass [was] inside [his] kneecaps." R. 61-62. While Ramos noticed improvement "for a little while" following his knee surgeries, R. 62, the "pain came back again," and so he now goes for injections of "lubricating gel" in both knees, R. 62. Ramos's pain is more or less the same as it was prior to having surgery. R. 64. The injections Ramos receives

4

"just alleviate[] [the pain] a little bit," and the pain "comes and goes," but having the injections is "better than not having [them]." R. 63. Ramos has difficulty walking because his legs hurt and sometimes buckle. R. 63. He also sometimes has "problems with [his] left leg because of [his] lower back," where his leg "gets numb" and "[i]t feels like electricity is going through it and pins and needles and [his] feet are getting numb." R. 63-64. While that occurs mostly in his left leg, it is "starting on [his] right leg too." R. 64. On a normal day, Ramos's knee pain is a "six to seven," with ten being the highest. R. 64-65. This pain in his legs makes it difficult for Ramos to sleep, causing him to wake up during the night. R. 77.

The attorney next questioned Ramos about pain in his back. Ramos testified that he first noticed pain in his back and spine getting worse when he "was doing a lot of standing." R. 65. Prior to stopping working, Ramos received injections for pain in his back and tried physical therapy, but the physical therapy made his back pain worse. R. 66. On a day-to-day basis, Ramos feels "pain in the lowest center of [his] back, sciatic nerve," and the pain "feels like a sharp knife twisting in [his] lower back" which "goes along with the fire shooting down [his] leg." R. 66-67. Ramos stated that three doctors have recommended back surgery, R. 66, which will entail his lower back being fused, R. 68. While he plans on having the surgery, Ramos has not been able to have it yet because the doctor he wants to use is out of network and he is having problems with his insurance. R. 68-69.

Ramos also testified about problems with his ankles, but confirmed that right now his ankles are not "the focus of his treatment." R. 70. Ramos has torn ligaments in his right ankle, and a heel spur on his left ankle. R. 69. This causes "[a] lot of pain." R. 69. His doctor has recommended stretches for his ankles, and has given him a cortisone shot. R. 70. Ramos twisted and injured his ankle while on a family vacation in Florida in 2015, when he slipped and

fell while exiting an elevator wearing flip-flops while the floor was wet and slippery.  R. 75-76.

In response to questioning from his attorney, Ramos also testified about limitations on his ability to lift and reach.  Ramos stated that he could lift up to 10 pounds, but has trouble lifting because of his back.  R. 71.  Ramos stated that he is not able to reach much overhead with his left arm because his shoulder "clunks inside," R. 71, and he feels "bone on bone," R. 72.  Ramos stated that he could reach in front of himself to use a computer, but that doing such a movement "starts to bother" him "[f]rom time to time."  R. 72.

Ramos testified that his wife works full time for the Manhattan District Attorney from 8:00 a.m. to 4:00 p.m., and that while she is out, he stays home by himself and watches television.  R. 73.  During the week, he drives to the train station to pick his wife up, and also will drive to buy some groceries, though he will not purchase a large load with several bags on his own.  R. 73-74.  Ramos prepares his own breakfast and lunch, R. 77, and prepares dinner for his wife, R. 73, 77, but otherwise his wife cleans their home and does their laundry, R. 77.  Ramos testified that he does not usually drive long distances, but will sometimes drive to visit family who live about 45 to 50 minutes away.  R. 74-75.  He also testified that he went on a vacation to Florida with family for several days in 2015, which is when he had the elevator accident, R. 75-76.

The ALJ questioned Ramos about his history of exercise and physical activity.  The ALJ noted that he had read that Ramos has a home gym, and asked whether that was correct.  R. 53.  Ramos responded that his wife uses a "little gym" with an elliptical and small weights in his grown son's former bedroom.  R. 53.  The ALJ asked him when the last time he used the elliptical machine was, and Ramos responded that he "do[es]n't work out."  R. 53-54.  In response to follow-up questions about whether he had ever used it, Ramos stated that he has

"never" used it and that he "do[es]n't like using it." R. 54. The ALJ asked Ramos whether he preferred running to the elliptical, and Ramos replied that he "do[es]n't run." R. 54. When questioned further about the last time he ran, Ramos responded that this was probably when he was working in corrections, likely over 10 years prior to the hearing, when he would have to run to respond to an alarm. R. 54-55. In response to the ALJ's observation that Ramos appeared to be in "pretty good shape," Ramos explained that "[i]t's because I worked out a lot. Throughout my whole life I worked out." R. 57. He continued, stating "all I did was work out in gyms," but explained that he "stopped working out years ago." R. 57. Ramos testified that he stopped working out, and "just tried to maintain [him]self" once the "pain in [his] back started worsening." R. 58. In response to the ALJ's question, Ramos denied injuring his shoulder while working out. R. 58. Ramos also testified that when he was a teenager, he boxed and studied martial arts with Ernest Hyman, R. 59, and later started working out on his own with boxing bags, R. 59-60, often using the gyms available on Riker's Island while he worked there, R. 60. Ramos denied continuing to box after his retirement. R. 60.

The ALJ consulted a vocational expert ("VE"), Mary Schiff, on the phone, who identified Ramos's past work as correction officer (Dictionary of Occupational Titles ("DOT") 372.667-018, medium exertional level); and security guard, also known as merchant patroller (DOT 372.667-038, light exertional level). R. 40-41.

C. The Medical Evidence

Both Ramos and the Commissioner have provided detailed summaries of the medical evidence. See Pl. Mem. at 4-22; Def. Mem. at 1-11. The Court had directed the parties to specify any objections they had to the opposing party's summary of the record, see Scheduling Order, filed Aug. 15, 2018 (Docket # 14), ¶ 5, and neither party has done so. Accordingly, the

Court adopts the parties' summaries of the medical evidence as accurate and complete for purpose of the issues raised in this suit. We discuss the medical evidence pertinent to the adjudication of this case in Section III below.

### D. The ALJ's Decision

The ALJ denied Ramos's application for DIB on August 5, 2016. R. 22-30. Following the five-step test set forth in SSA regulations, the ALJ found that Ramos met the insured status requirements and had not engaged in "substantial gainful activity since February 7, 2014, the alleged [disability] onset date." R. 24. At step two, the ALJ found that Ramos had the following severe impairments: "status post left shoulder rotator cuff surgery, status post bilateral meniscus surgery, obesity, and lumbar herniated discs with left leg radiculopathy." R. 24. The ALJ also noted that Ramos had the nonsevere impairments of hypertension, high cholesterol, and acid reflux. R. 24-25. The ALJ noted that while Ramos had been "evaluated and treated" for these conditions, they "were being managed medically, and should be amenable to proper control by adherence to recommend medical management and medication compliance," and were accordingly not severe. R. 25.

At step three, the ALJ concluded that none of Ramos's severe impairments singly or in combination met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). R. 25. The ALJ specifically considered Listing 1.02, "Major dysfunction of the joint(s) (due to any cause)," as well as Listing 1.04, "Disorders of the spine." R. 25. Pointing to evidence in the record, the ALJ concluded that Ramos's impairments did not meet Listing 1.02 because "he demonstrates almost full range of motion along with full strength in his left shoulder." R. 25. The ALJ concluded that Ramos's degenerative disc disease did not meet Listing 1.04 because evidence in the record did not demonstrate that his impairments met

the required criteria, and, to the contrary, he was repeatedly observed "demonstrating a normal gait." R. 25.

The ALJ also considered Ramos's obesity, and noted that while no physician stated it was disabling, it "was considered in terms of its possible effects on [Ramos's] ability to work and ability to perform activities of daily living," as required by Social Security Ruling 02-01p. R. 25. The ALJ noted while he did find Ramos's obesity to be severe, "the signs, symptoms and laboratory findings of his obesity are not of such severity as found in any related listing." R. 25-26.

Before moving to step four, the ALJ assessed Ramos's residual functional capacity ("RFC"). R. 26-29. The ALJ determined that Ramos retained the ability to perform sedentary work, as defined in 20 C.F.R. 404.1567(a), except that Ramos "is limited to occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling." R. 26.

 In making this determination, the ALJ considered Ramos's description of his impairments, but found that his "statements concerning the intensity, persisting, and limiting effects of these symptoms are not generally consistent with the evidence." R. 26. Citing Ramos's physical therapy records from 2014, the ALJ noted that "the claimant has willingly described the pain he suffers as intermittent in nature." R. 26 (citing R. 293). The ALJ also noted that by 2015, treatment notes reflected Ramos reporting significant improvement in his shoulder pain,  range of motion, and strength since his 2013 rotator cuff tear, though the ALJ did note that Ramos still reported feeling a "clunk" in his left shoulder "at times." R. 26-27 (citing R. 534, 617, 680).

The ALJ next considered Ramos's physician Michael Cushner's advice that Ramos undergo a left knee arthroscopy after other treatments failed to improve Ramos's condition. R.

27 (citing R. 422).  The ALJ noted that while Dr. Cushner stated in an undated letter, titled

"Medical Necessity for Left Knee Arthroscopy," that physical therapy had not been effective, the

record indicates that physical therapy had in fact resulted in some improvement of Ramos's

knee.  R. 27 (citing R. 602-05, 617-29).  The ALJ also noted that following the knee surgery,

Ramos was provided a cane to use on "an as needed basis" and was able to walk without it by

March 2016.  R. 27 (citing R. 425, 430, 722).

The ALJ then considered Ramos's July 2014 MRI scans of his lumbar and cervical

spines, and a subsequent musculoskeletal examination, which revealed that his "range of motion

in the cervical and lumbar spine had decreased."  R. 27 (citing R. 285-88, 380-85, 386-87).  The

ALJ considered subsequent imaging and spinal examinations, R. 27, and noted that "[i]n

response to his decreased range of motion, the claimant repeatedly opted to pursue conservative

management of his impairment, which was to include physical therapy."  R. 27 (citing R. 387,

630-51, 652-54, 710).  The ALJ also noted that "[d]espite the use of steroidal injections, the

claimant still experiences lower back pain while standing."  R. 27 (citing R. 608-09).

The ALJ next discussed Ramos's gait and ability to walk, R. 27-28, as well as his

obesity, R. 28.  The ALJ noted that Ramos had a Body Mass Index ("BMI") of 33.5, putting him

in the category of "Level I obesity."  R. 28.  The ALJ noted that while he had considered

Ramos's obesity "in regards to all other impairments noted [in the decision]," he observed that

"at no point in the record is it indicated that the claimant's obesity has impacted other

impairments."  R. 28.

Next, the ALJ considered the opinion evidence contained in the record.  He first

considered the opinion of Dr. Sharon Revan, a consultative examiner who "opined that [Ramos]

had mild limitation of his left upper extremity to gross and motor activity, moderate limitations

with standing and walking, and limitation with climbing stairs and sitting." R. 28 (citing R. 431, 504-11, 512-17). The ALJ assigned this opinion "great weight," reasoning that "[w]hile Dr. Revan is not a treating source, her opinion is consistent with medical evidence of record, which demonstrates that despite the intensity of the claimant's complaints, he is still capable of taking part in light activities such as walking, sitting, and standing on his own." R. 28. He also noted that "Dr. Revan's opinion is further corroborated by concurrent x-ray testing results, which showed no abnormalities." R. 28 (citing R. 433-34, 510-11, 518-19).

The ALJ accorded "some weight" to the opinion of Dr. D. Mikelis, who opined that Ramos "should refrain from any activity that exacerbates symptoms such as heavy lifting, carrying or bending." R. 28 (citing R. 653-54). In according this opinion "some weight," the ALJ reasoned that "[w]hile Dr. Mikelis had not examined the claimant in more than a year, he was able to perform a musculoskeletal examination of the claimant and support his assertions with diagnostic imaging," and noted that the restrictions Dr. Mikelis identified were "consistent with the reduced range of sedentary work found in the RFC as well as the claimant's request during examination with Dr. Miekelis to pursue conservative treatment that includes physical therapy." R. 28.

After stating his conclusion as to Ramos's RFC, discussed above, R. 28, the ALJ explained his reasons for not fully crediting the extent of Ramos's alleged symptoms, R. 28-29. The ALJ noted that "[d]espite allegations of disabling symptoms, physical and mental status examinations generally indicated unremarkable findings." R. 28. The ALJ also observed that Ramos himself had described being able to perform daily activities "which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations," including "showering and dressing himself as well as being able to cook, clean, shop, and do laundry, if

needed." R. 29 (citing R. 429). The ALJ also noted that Ramos testified that after being laid off, Ramos's "initial job search included applying and interviewing for patrol jobs." R. 29. The ALJ noted that when Ramos was given a recommendation for back surgery on February 29, 2016, "the surgery was described as elective and the claimant elected to wait because he preferred to use an out of network doctor," which the ALJ reasoned indicated that the impairment was not so severe as to require immediate treatment. R. 29. Further, the ALJ noted that Ramos "provided conflicting reports" about his impairments. R. 29. While during the hearing, Ramos testified that he had not boxed, run, or used an elliptical machine since his retirement in 2005, the record indicated that his 2013 shoulder injury was traced to an incident involving hitting a heavy bag, use of his home elliptical machine was discussed in 2015, and running during a family softball game in 2015 was discussed as a cause of swelling in his knee. R. 29 (citing R. 290, 620, 624).

At step four, the ALJ concluded that Ramos was "capable of performing past relevant work as a corrections officer." R. 29. The ALJ found that Ramos could perform the position as he actually performed it, because while "work as a corrections officer is classified as medium work, the claimant testified that during his last three years it was primarily a desk job consisting of checking in inmates who arrived at the courthouse, consistent with sedentary work." R. 29. Accordingly, the ALJ determined that Ramos was not disabled under the Act. R. 29.

II. GOVERNING STANDARDS OF LAW

A. Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d

370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 374-75; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). The "threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp.

2d at 454 (citations and internal quotation marks omitted).  Importantly, it is not a reviewing

court's function "to determine de novo whether [a claimant] is disabled."  Schaal v. Apfel, 134

F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v.

Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

B.  Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see id.

§ 1382c(a)(3)(A).  A person will be found to be disabled only if it is determined that his

"impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam);

Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the

Commissioner must use in evaluating a disability claim.  See 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the

Commissioner must determine whether the claimant is currently engaged in any "substantial

gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  Second, if the claimant is

not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a

"severe medically determinable physical or mental impairment," 20 C.F.R.

§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments

that "significantly limits [the claimant's] physical or mental ability to do basic work activities,"

20 C.F.R. §§ 404.1520(c), 416.920(c).  Third, if the claimant's impairment is severe and is listed

in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments,

the claimant must be found disabled regardless of his or her age, education, or work experience.

See 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).  Fourth, if the

claimant's impairment is not listed and is not equal to one of the listed impairments, the

Commissioner must review the claimant's RFC to determine if the claimant is able to do work

he or she has done in the past, i.e., "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(iv),

416.920(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  20 C.F.R.

§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform past

relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her

age, education, and work experience, permits the claimant to do other work.  20 C.F.R.

§§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she

will be deemed disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The claimant bears

the burden of proof on all steps except the final one — that is, proving that there is other work

the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

## III.  DISCUSSION

Ramos raises four grounds for reversing the ALJ's decision: (1) that the ALJ ignored the

opinions of treating physician Dr. Cushner without providing an explanation, Pl. Mem. at 23-24;

(2) that the ALJ erred by affording more weight to the opinion of consultative examiner Dr.

Sharon Revan than to the opinion of treating physician Dr. Cushner, id. at 26;[2] (3) that the ALJ

erred by determining that Ramos has the RFC to perform sedentary work, while also finding that

he can return to his past relevant work as a corrections officer, classified as medium work, id. at

24-25; and (4) that the ALJ erred by failing to obtain testimony from a medical expert to

determine whether one of Ramos's impairments equaled a medical listing, id. at 25-26.  We

discuss each argument next.

A.  The "Treating Physician" Rule[3]

Under the so-called "treating physician" rule, in general, the ALJ must give "more

weight to medical opinions" from a claimant's "treating source" — as defined in the regulations

— when determining if the claimant is disabled.  See 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2).  Treating sources, which includes some professionals other than physicians, see

20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2), "may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone or from reports of

individual examinations, such as consultative examinations."  20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2).  The Second Circuit has summarized the deference that must be accorded the

opinion of a  "treating source" as follows:

---

[2]  In his briefing papers, Ramos makes this argument under the heading "The ALJ's decision is not based on substantial evidence."  Pl. Mem. at 26.  However, the above-described argument is the only argument raised in this section and it relates only to the treating physician rule.  In other words, there is no additional argument raising lack of substantial evidence for the ALJ's RFC determination.

[3]  The SSA issued new rules that apply to the evaluation of opinion evidence, but these rules apply only to claims filed on or after March 27, 2017.  See 20 C.F.R. 404 § 1527.  Because Ramos's claim was filed before March 27, 2017, see 20 C.F.R. § 404.514; R. 175-81, the regulations contained in 20 C.F.R. § 404.1527 apply.  See 20 C.F.R. § 404.1527.

> Social Security Administration regulations, as well as our precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion. First, the ALJ must decide whether the opinion is entitled to controlling weight. "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Burgess, 537 F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)). Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it. In doing so, it must "explicitly consider" the following, nonexclusive "Burgess factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." Selian[, 708 F.3d at 418] (citing Burgess, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives] treating source's [medical] opinion." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)). . . . An ALJ's failure to "explicitly" apply the Burgess factors when assigning weight at step two is a procedural error. Selian, 708 F.3d at 419-20.

Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019). Accordingly, the Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; accord Estrella, 925 F.3d at 96; see also Greek, 802 F.3d at 375-77.

Nonetheless, the Commissioner is not required to give deference to a treating physician's opinion where the treating physician "issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran, 362 F.3d at 32 (citation omitted). In fact, "the less consistent [a treating physician's] opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d

Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citation omitted).  Finally, a "slavish recitation of each and every [factor listed in 20 C.F.R. § 404.1527(c)]" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear," Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing Halloran, 362 F.3d at 31-32), and even where the ALJ fails to explicitly apply the "Burgess factors," a court may, after undertaking a "'searching review of the record,'" elect to affirm the decision if "'the substance of the treating physician rule was not traversed.'"  Estrella, 925 F.3d at 96 (quoting Halloran, 362 F.3d at 32).

In his submissions, Ramos argues that "the ALJ failed to accord any weight, no less controlling weight, to Dr. Cushner's opinions."  Pl. Mem. at 24.  However, Ramos does not identify a particular "opinion" provided by Dr. Cushner in the record; that is, Ramos does not point to a single statement from Dr. Cushner opining about Ramos's "physical or mental restrictions" or discussing "what [he] can still do despite impairment(s)."  20 C.F.R. § 404.1527(a)(1); see Pl. Mem. at 23-24.  As the Commissioner notes, the record contains an undated letter from Dr. Cushner stating that knee arthroscopy is medically necessary.  Def. Mem. at 19 (citing R. 422).  The letter is addressed to "whom it may concern" and appears to be directed at an insurer.  R. 422.  The letter notes that knee arthroscopy is medically necessary for Ramos because other treatments have not been successful in treating his "continued pain and discomfort, effusion and mechanical symptoms," which, the letter notes, "limit[] his ability to use his knee with limited range of motion and pain with activity."  R. 422.  While these statements do discuss Ramos's symptoms and note limitations, the letter does not discuss the extent of the functional limitations caused by Ramos's symptoms, nor does it discuss the

implications for Ramos's ability to work.  As a result, the ALJ cannot be faulted for failing to give "controlling weight" to the statements contained in this letter since they do not speak to Ramos's ability to work.  Rather, the statements speak only to the medical necessity of knee surgery for Ramos.  Notably, the ALJ did consider these statements in determining Ramos's RFC.  R. 27.  The record does not contain any other statements attributable to Dr. Cushner that could be construed as "opinions" as to Ramos's functional limitations; rather, his notes consist at most of descriptions of Ramos's symptoms and progression following his rotator cuff and knee surgeries.  See R. 464-65, 469-72, 474-77, 483-85, 498-99, 528-33, 617-22, 730-45, 747-59, 770, 773-82, 790-93, 796-97, 804-10, 812-14, 818-49.  Ramos has made no argument that Dr. Cushner's notes contradict the ALJ's RFC determination.  Accordingly, the treatment accorded to Dr. Cushner's records is not a ground for remand.

      B.  <u>Weight Afforded to the Opinion of Consultative Examiner Dr. Sharon Revan</u>

      Ramos argues that the ALJ erred by according "'great weight' to the opinion of non-treating, one-time consultative examiner Dr. Revan," Pl. Mem. at 26 (citing R. 28), while "fail[ing] to accord any weight, no less proper weight, to the treating physician Dr. Cushner's opinions," <u>id.</u> (citing R. 27).  While Ramos makes this argument under a heading titled "The ALJ's decision is not based upon substantial evidence," <u>id.</u>, this argument is really about the ALJ's alleged failure to follow the treating physician rule.  Indeed, in his briefing papers, Ramos points to a case from the Sixth Circuit which states that "an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions [of treating physicians] and for explaining precisely how those reasons affected the weight' given '<u>denotes a lack of substantial evidence</u>, even where the conclusion of the ALJ may be justified based upon the record.'"  Pl. Mem. at 26 (quoting <u>Blakley v. Comm'r Of Soc. Sec.</u>, 581 F.3d 399, 407 (6th

Cir. 2009) (quoting <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 243 (6th Cir. 2007)) (alteration supplied) (emphasis in original). As discussed above in Section III.A, Ramos does not identify any "opinions," within the meaning of 20 C.F.R. § 404.1527(a)(1), that can be attributed to Dr. Cushner, and we have found none in the record. Accordingly, the ALJ was not required to give "good reasons" for not giving Dr. Cushner's statements controlling weight.

While the opinion of a treating physician is to be afforded special deference, the opinion of a consultative expert can constitute substantial evidence. <u>See</u> <u>Mongeur</u>, 722 F.2d at 1039. Here, the ALJ followed the requirements of 20 C.F.R. § 1527 in according great weight to Dr. Revan's opinion. While the ALJ noted that "Dr. Revan is not a treating source," the ALJ reasoned that "her opinion [was] consistent with the medical evidence of record, which demonstrates that despite the intensity of the claimant's complaints, he is still capable of taking part in light activities such as walking, sitting, and standing on his own." R. 28. Indeed, the record supports the ALJ's observations, since there is evidence that Ramos could participate in light activities that require standing and walking, such as cooking, grooming himself, walking to his car and driving, R. 73-77, 506, as well as performing strengthening exercises at home, including using an elliptical machine, R. 620. <u>See</u> 20 C.F.R. § 1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). In addition, the ALJ noted that "Dr. Revan's opinion is further corroborated by concurrent x-ray testing results, which showed no abnormalities," R. 28, a statement that is also supported by evidence in the record, <u>see</u> R. 433-34, 510-11, 518-19. The support in the record for Dr. Revan's opinion provides another ground, under the regulations, for the ALJ to accord it great weight. <u>See</u> 20 C.F.R. § 1527(c)(3). Accordingly, the ALJ did not err in giving Dr. Revan's opinion great weight.

C. <u>Ramos's Ability to Perform Past Relevant Work</u>

Ramos argues that because the ALJ found that Ramos had the RFC to perform only sedentary work, the ALJ improperly "concluded that plaintiff can return to his past relevant work as a corrections officer, which is classified as medium work." Pl. Mem. at 24.

At step four of the ALJ's five-step process for determining a claimant's RFC, "the claimant has the burden to show an inability to return to [his or] her previous specific job and an inability to perform her past relevant work generally." <u>Glessing v. Comm'r of Soc. Sec. Admin.</u>, 725 F. App'x 48, 49 (2d Cir. 2018), <u>as amended</u> (Feb. 27, 2018) (citing <u>Jasinski v. Barnhart</u>, 341 F.3d 182, 185 (2d Cir. 2003)). "This inquiry requires separate evaluations of the previous specific job and the job as it is generally performed." <u>Id.</u> (internal citation omitted). "The Dictionary of Occupational Titles ("DOT") is used to evaluate jobs as they are generally performed." <u>Petrie v. Astrue</u>, 412 F. App'x 401, 409 (2d Cir. 2011) (citation omitted). "While an expert is often called upon to explain the requirements of particular jobs, . . . step four of the analysis does not require that an ALJ consult an expert." <u>Id.</u> (some citations, internal quotation marks, and emphasis omitted) (citing 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2)); <u>accord</u> 20 C.F.R. § 505.1560(b)(2) ("A vocational expert or specialist <u>may</u> offer expert opinion testimony . . . about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.") (emphasis added).

Here, the ALJ did not find that Ramos was able to perform the position of corrections officer as it is generally performed, which is at the medium exertional level. R. 29. Rather, the ALJ found that Ramos was able to perform the position as he actually performed it. <u>Id.</u> Ramos

was quite specific about the requirements of the job he previously preformed. He testified that he was seated at his post for all but an hour of his seven hour day, and during that time he merely had to stand as prisoners arrived by bus. R. 56-57; see also R. 55 (describing his job as a "sitting post"). Thus, the ALJ accurately found that "[w]hile the claimant's work as a corrections officer is classified as medium work, the claimant testified that during his last three years it was primarily a desk job consisting of checking in inmates who arrived at the courthouse, consistent with sedentary work. . . . [t]he claimant only stood when buses containing inmates arrived." R. 29. Indeed, Ramos does not argue that the job as he actually performed it could not be performed by someone with the RFC that the ALJ found Ramos to possess. See Pl. Mem. at 24-25. Rather, Ramos argues that the ALJ failed to "reconcile" an "inconsistency" — that is, the ALJ's finding that Ramos could "return to his past relevant work as a corrections officer," which, according to the DOT, "is classified as medium work," and the ALJ's finding that Ramos has the RFC "to perform sedentary work." Pl. Mem. at 24. However, the Second Circuit rejected a similar argument in Jasinski v. Barnhart, 341 F.3d 182 (2d Cir. 2003), in which it found that there was no "conflict" in situations where a vocational expert's identification of an exertional level of a job as actually performed by a claimant differs from the exertional level associated with that job as generally performed and as contained in the DOT. See id. at 185. This reasoning applies equally here. Ramos's hearing testimony clearly supports the ALJ's conclusion that the corrections officer position as Ramos performed it during his last three years before retirement was consistent with his RFC. Accordingly, the ALJ committed no error.

   D.  Determination that Plaintiff's Impairments Did Not Medically Equal a Medical
       Listing

   Ramos argues that the ALJ erred by failing to obtain testimony from a medical expert to determine whether one of Ramos's impairments met or equaled one of the Listings. Pl. Mem. at

25-26.  Ramos argues that "[i]n the instant case, the ALJ summarily states that Listings 1.02 and

1.04 did not apply," and "[a]t the very least, the ALJ should have obtained an ME to determine

whether Plaintiff's impairments equal a medical listing."  Pl. Mem. at 25.  Ramos argues that

"[r]emand is thus warranted for proper evaluation of all the medical evidence of record and for

medical expert testimony as to whether Plaintiff's combined impairments equal any listing(s)."

Id. at 25-26.

The governing regulations provide that while "Administrative law judges are responsible

for reviewing the evidence and making administrative findings of fact," they "may also ask for

medical evidence from expert medical sources."  20 C.F.R. § 404.1513a(b).  Guidance issued by

the Social Security Administration provides that "[a]t the hearings level of the administrative

review process, administrative law judges . . . determine whether an individual's impairment(s)

meets or medically equals a listing at step 3 of the sequential evaluation process."  SSR 17-2p,

2017 WL 3928306, at *3.  This guidance provides that "[t]o assist in evaluating this issue,

adjudicators at the hearings level may ask for and consider evidence from medical experts (ME)

about the individual's impairment(s), such as the nature and severity of the impairment(s)."  Id.

(emphasis added).  In other words, it is not mandatory to seek evidence from a medical expert at

Step 3; rather, it is discretionary.

In an unpublished decision, the Second Circuit held that while "an ALJ 'should set forth

a sufficient rationale in support of his decision to find or not to find a listed impairment,' . . .  the

absence of an express rationale for an ALJ's conclusions does not prevent [a court] from

upholding [the ALJ's determination] so long as we are 'able to look to other portions of the

ALJ's decision and to clearly credible evidence in finding that his determination was supported

by substantial evidence.'"  Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112 (2d Cir.

23

2010) (summary order) (citing <u>Berry v. Schweiker</u>, 675 F.2d 464, 469 (2d Cir. 1982)).

In other words, the ALJ here was not required to consult a medical expert in order to determine whether any of Ramos's impairments met or equaled one of the Listings. The fact that the ALJ did not consult a medical expert is thus not itself grounds for remand. In addition, we disagree that the ALJ "summarily state[d]" that Listings 1.02 and 1.04 did not apply. <u>See</u> Pl. Mem. at 25. Rather, the ALJ reviewed the requirements of each of those listings, and pointed to specific evidence in the medical record that showed that Ramos's shoulder and back impairments did not rise to the level of the Listings' requirements. R. 25. Ramos makes no specific argument that the ALJ's conclusions regarding the Listings were not supported by substantial evidence — only that he should have consulted a medical expert to properly arrive at his conclusion.

Nonetheless, we note that the ALJ's findings are supported by substantial evidence. Listing 1.02, "Major dysfunction of the joint(s) (due to any cause)" is "[c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.02. In addition, to meet or medically equal this listing, a claimant must also demonstrate:

> A) involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or

> B) involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00.B2c.

Id.  Substantial evidence in the record shows that Ramos's knee and ankle impairments do not meet the first additional criterion: that is, an "inability to ambulate effectively."  As the ALJ observed, multiple entries in the record observe Ramos walking with a normal gait.  See R. 261, 264, 268, 551, 608, 639.  In addition, a note from a July 30, 2014, office visit indicates that Ramos was "able to do moderate exertion (jogging)," R. 248, and a note from 2015 indicates that while Ramos was not able to run, he had been using his elliptical machine, R. 620.  In addition, during the hearing, Ramos testified that he will "take a walk to [his] car" to pick up his wife from the train station each day, and may take his car to buy "a few things" from the grocery store."  R. 73-74.  There is also some evidence that Ramos played softball.  R. 624 (medical record recounting that Ramos "played family softball less than one month ago").

Substantial evidence also shows that Ramos's left shoulder impairment does not meet the second condition noted above, the "inability to perform fine and gross movement effectively." As the ALJ pointed out, medical records show that Ramos "demonstrates almost a full range of motion along with full strength in his left shoulder."  R. 25 (citing R. 617).  In addition, during the hearing and at his consultative examination, Ramos reported being able to drive, cook, groom himself, dress himself, and do some shopping, R. 73-74, 429, all of which demonstrate the ability to perform fine and gross movement effectively, see 20 C.F.R. Part 404, Subpart P, App'x 1 at 1.00.B.2(c).

Substantial evidence also supports the ALJ's conclusion that Ramos's back impairment did not meet Listing 1.04, "Disorders of the spine," which includes disorders such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture, resulting in compromise of a nerve root (including the cauda equina) or the spinal cord."  20 C.F.R. § Pt. 404, Subpt. P, App. 1§ 1.04.  To meet Listing 1.04,

the record must reflect compromise of the nerve root (including cauda equina) or the spinal cord with additional findings of:

> a) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> b) Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> c) Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Id.  As the Commissioner points out, "[t]he record shows negative straight leg raising tests and no evidence of nerve root compression or spinal aracnoiditis."  Def. Mem. at 16 (citing R. 432, 543, 546, 551, 688-99).  In addition, Ramos "is repeatedly observed as demonstrating a normal gait," R. 25, and therefore did not demonstrate an "inability to ambulate effectively."  Accordingly, the ALJ's finding was supported by substantial evidence.

IV. CONCLUSION

For the foregoing reasons, Ramos's motion for judgment on the pleadings (Docket # 15)

is denied and the Commissioner's motion for judgment on the pleadings (Docket # 20) is

granted. The Clerk is requested to enter judgment.

SO ORDERED.

Dated: New York, New York
September 19, 2019

GABRIEL W. GORENSTEIN
United States Magistrate Judge

27